**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    **Plaintiff,**

vs.          **No. 19-CR-4440-MV**

NICHOLOUS PHILLIPS,

    **Defendant.**

**<u>DEFENDANT'S OBJECTION TO PRESENTENCE INVESTIGATION
REPORT AND MOTION FOR DOWNWARD VARIANCE</u>**

Defendant Nicholous Phillips ("Mr. Phillips"), by and through his counsel, Romero &
Winder, PC (Joe M. Romero, Jr.), respectfully moves this Court for a downward variance of the
Guidelines Sentence pursuant to 18 U.S.C. §3553(a). As grounds, Mr. Phillips submits the
following:

**I. Mr. Phillips is not subject to the Armed Career Criminal Act Mandatory Minimum
Sentence**

Since the filing of Mr. Phillips' Sentencing Memorandum (Doc. 101) on January 31,
2021, the Supreme Court issued its ruling in *Borden v. United States*, 593 U.S. ___ (2021). In
*Borden,* the Supreme Court held that "[o]ffenses with a *mens rea* of recklessness do not qualify
as violent felonies under ACCA." *Id.* at 23. In so doing, and as applicable to Mr. Phillips' case,
the Supreme Court effectively overruled *Unites States v. Pam,* 867 F.3d 1191 (10th Cir. 2017).
Id. at 3 n.1, 26-27 n.19. As such, Mr. Phillips' prior state law conviction for shooting at or from a
motor vehicle does not, post-*Borden*, qualify as a predicate offense for ACCA purposes.

As the Court is aware, during pretrial litigation in this case, the Court relied on *Pam* in
finding that Mr. Phillips' prior state law conviction for shooting at or from a motor vehicle

qualified as an ACCA eliglble predicate offense. Doc. 61. After the *Borden* opinion was issued, Mr. Phillips filed a Motion to Reconsider the Court's ACCA related ruling. Doc. 106. In its response to the Motion to Reconsider, the government concedes that "*Pam* has been expressly overruled, and [Mr. Phillips'] prior conviction under New Mexico law for shooting at or from a motor vehicle no longer qualifies as a predicate offense for ACCA purposes." Doc. 107.

As such, post-*Borden*, Mr. Phillips objects to references in the Presentence Investigation Report (PSR) which contend that Mr. Phillips is or may be subject to sentencing pursuant to ACCA. See PSR, ¶ 17, ¶ 29, ¶ 30, ¶ 47, and ¶ 105.

Although as part of his plea Mr. Phillips agreed not to seek a variance in this case (Doc. 97 at ¶ 4), the intervening change in law occasioned by the *Borden* opinion constitutes a fair and just reason for requesting a withdrawal of this specific plea provision. Fed. R. Crim. P. 11(d)(2); *United States v. Bunner*, 134 F.3d 1000 (10th Cir. 1998) ("Subsequent to entering the agreement, an intervening change in the law destroyed the factual basis supporting Defendant's conviction."); id. at 1002 ("After Defendant served approximately three years, the Supreme Court decided . . . [that] Defendant's actions no longer constituted a § 924(c) violation." (citing *Bailey v. United States*, 516 U.S. 137 (1995)).

## II.    Request for Downward Variance

### A.    Introduction

By way of his variance request, and pursuant to the factors enumerated in 18 U.S.C. § 3553(a), Mr. Phillips respectfully requests a downward variance to a sentence of ten (10) years or 120 months – which is the equivalent to the mandatory minimum sentence applicable to Count II of the Superseding Indictment, to wit: possession with intent to Distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. ¶¶ 841(a)(1) and (b)(1)(A).

2

**B.      Background Information**

The information included here was obtained from consulting with Mr. Phillips and his prior attorney, Mr. David Ring, as well from a review of the 2011 psychological evaluation performed by Dr. Elliot Rapoport and the 2019 neuropsychological evaluation performed by Dr. Rex Jung. Both these psychological reports are included, respectfully, as Exhibits A and B to Mr. Phillips previously filed Sentencing Memorandum. Doc. 101. Also, the information included here was obtained from a review of the transcript of Mr. Phillips supervised release violation hearing (SRV) which took place on September 3, 2019, and is attached hereto as Exhibit D.[1]

The biographical information contained in Dr. Rapoport's evaluation notes that Mr. Phillips' parents divorced when he was 7 years old, and that Mr. Phillips was physically and sexually abused as a child. Dr. Rapaport Eval, at 2, 7-8. During childhood, Mr. Phillips was routinely expelled from every school he attended for disruptive behavior. *Id.* at 3. At a young age, Mr. Phillips was committed to the Charter Behavioral Health Hospital for mental health treatment. *Id.*

After dropping out of high school in the ninth grade, Mr. Phillips was incarcerated, from 1995 through 1996, at the Youth Diagnostic and Detention Center (YDDC) in Albuquerque. Id. Mr. Phillips reported using crystal methamphetamine at age 17 and subsequently used it on a regular basis. *Id.* Due to his childhood trauma and long-standing substance abuse history, Dr. Rapoport noted that Mr. Phillips requires significant and in-depth psychopharmacological and psychotherapeutic intervention. Id. at 9.

Dr. Rapoport diagnosed Mr. Phillips with Bipolar Disorder (depressive phase), in addition to a secondary diagnosis of Posttraumatic Stress Disorder (chronic) and Polysubstance

---

[1] The transcript of the SRV hearing is labeled Exhibit D as it is requested that this pleading be reviewed in conjunction the previously filed Sentencing Memorandum, Doc. 101, which includes within it Exhibits A thru C.

Dependence. Id. at 8. Dr. Rapaport described Mr. Phillips having low self-esteem and comparing himself unfavorably to others. Id. at 7. He noted that Mr. Phillips was vulnerable to episodes of major depression, as well as oppositional tendencies associated with underlying feelings of anger and resentment. Id. Given his history of sexual and physical abuse as a child, Dr. Rappaport opined that his intense negative and painful emotions were the likely cause of his dysphoria (unease and dissatisfaction with life) and bouts of major depression. Id. at 7.

On July 27, 2010, Mr. Phillips was taken into federal custody after being federally charged with the offense of felon in possession of a firearm, an offense which occurred on October 3, 2009.[2] On March 5, 2012, the Judgment in Mr. Phillips' 2009 case sentencing Mr. Phillips to a term of imprisonment of sixty (60) months. See Case No. 09-CR-3601 MV, Doc. 52.

In September 2018, after serving the sixty (60) month sentence in Case No. 09-CR-3601 MV, Mr. Phillips commenced serving a two-year term of supervised release. As a condition of his supervised release, Mr. Phillips was required to participate in mental health and substance abuse treatment at The Evolution Group (TEG).

At TEG, Mr. Phillips was referred to medical management in January 2019, however he was not prescribed actual prescription medication until April 2019.   See Ex. D, Transcript of Supervised Release Violation (SRV) hearing at 17. While at TEG, Mr. Phillips was not prescribed any medication until April 2019. The medication regimen, according to Mr. Phillips,

---

[2] During his prosecution in the 2009 federal case (i.e., United States v. Phillips, No. 09-CR-3601 MV), Mr. Phillips was serving a state prison sentence. As such, he was detained federally for an extended period (in federal pretrial or pre-sentence detention status) pursuant to a federal writ of mandamus ad prosequendum. Although he pled guilty to the federal offense in No. 09-CR-3601 MV on April 26, 2011, he was returned to state custody to complete service of his state sentence. As such, he did not start serving his federal sentence until after March 5, 2012. During his extended federal pre-sentence confinement, Mr. Phillips received no federal custody credit since, by virtue of Mr. Phillips being detained by virtue of a writ, the State of New Mexico retained primary jurisdiction over Mr. Phillips, thus making Mr. Phillips ineligible for federal custody credit. See, Salley v. United States, supra; Hernandez v. United States Attorney General, 689 F.2d 915 (10th Cir. 1982).

varied and was ineffective; it also made Mr. Phillips "visibly ill". Ex. D at 17:4-7. As a result, his treatment provider and his psychiatrist at TEG allowed him to stop taking medication in July 2019. Id. As such, during his supervised release term, he was prescribed a medication regimen, ineffective as it was, for approximately a four-month period.

The one medication Mr. Phillips requested but was not prescribed during this period was Adderall.  According to Mr. David Ring, Mr. Phillips' prior defense counsel, Mr. Phillips had previously been diagnosed with ADHD, bipolar disorder, depression, and post-traumatic stress disorder. However, because the evaluation was dated (having been completed in 2011), his treatment providers in 2019 wanted an updated evaluation due to TEG's concern that Adderall contained amphetamine as an ingredient. At the September 3, 2021 hearing, the probation officer confirmed that a primary purpose for the requested updated neuropsychological evaluation was to confirm Mr. Phillips' ADHD diagnosis and thus, presumably, validate the requested the Adderall prescription. Ex. D, id. at 17:9-11.

In terms of the timeline for completing the requested updated evaluation, the probation officer informed the Court that the first available appointment for a TEG sponsored neuropsychological evaluation was February 2020.  Ex. D, id. at 17:19-21. The Court objected noting that the updated evaluation needed to be completed sooner:

> THE COURT: Oh, no. We can do that immediately through the Court. Come to me next time, because this is taking too long. We don't know what the problem is, and we can't get the medication, and we have these dirty urines. That's just not acceptable. We need to be making more progress.

Ex. D, id. at 17:25 – 18:1-4

Also, at the hearing, the parties discussed the need to obtain and provide to the evaluator with Mr. Phillips medical records from the Federal Bureau of Prisons from and the New Mexico

Department of Corrections. Ex. D, id. at 12:3-8 and 12:9-20. It was the intent and hope of all parties that once Mr. Phillips' medical records were retrieved and the updated evaluation was completed, Mr. Phillips would finally receive the proper medication regimen he desperately needed, including, if warranted, a prescription for Adderall.

At the hearing, the Court admonished Mr. Phillips for not previously informing his treatment providers at TEG of the full extent of mental health issues.

> In your initial evaluation, is what I'm saying, with Evolution, so you waste all of this time when you first get out of prison and you're first starting your evaluation. And these people are talking to you in an effort to try to help you. And Dr. Rapoport has done an evaluation in which he says that you've gone through most of your life without the right treatment and right medication, and it is a very difficult thing that you have endured.

Ex. D, id. at 13:4-20.

In response, Mr. Phillips acknowledged his error. He told the Court that given his prior bad experience both as a child at Charter Behavioral Health Hospital and in the prison setting regarding prior prescription issues (Ex. D, id. at 12:9-17 and 15:16-23), he had resigned himself to expect an unsuccessful outcome at TEG.

> THE DEFENDANT: …. I'm not trying to make excuses or anything. I'm just trying to explain … what I was thinking at the time. Any, you know, I've had that happen to me everywhere I went. They just didn't' have time or it wound up where it didn't work out. And I honestly didn't think that they [TEG]were going to have time, or it was going to work out with Evolution either. You know what I mean? I just thought it was going to be a big -- I was going to put myself into it, try to talk to them, and open all those wounds, and then it was just going to be for nothing in the end.

Ex. D, id. at 23:14-23.

After admitting to his violations of supervised release, the Court found that Mr. Phillips had violated his conditions of supervised release. However, by agreement and request of the parties, the Court held the petition in abeyance. Ex. D, id. at 26:5-9. The

Court required Mr. Phillips to continue his participation in his assigned Intensive

Outpatient Program (IOP) and ordered an updated neuropsychological evaluation.

 The Neuropsychological Evaluation, authored by Dr. Rex Jung, was completed on

October 8, 2019, approximately 38 days prior to his arrest in this case. Dr. Jung's evaluation

essentially confirms the findings previously made by Dr. Rapaport in his 2011 evaluation.

Specifically, Dr. Jung reported that due to Mr. Phillips' childhood trauma and substance abuse

history, he required significant and in-depth psychopharmacological and psychotherapeutic

intervention. He noted that Mr. Phillips struggled with sobriety and continually relapsed to the

use of methamphetamine to cope with "significant PTSD symptoms of nightmares,

hypervigilance and intrusive thoughts".

Regarding Mr. Phillips' ADHD, Dr Jung opined that the prescription drug, Strattera,

could be helpful in producing neuronal tone consistent with treatment for adult ADHD and

problematic behaviors that result in drug-seeking and impulsive criminal activity. Dr. Jung noted

that this medication could be helpful in treating symptoms of both ADHD and PTSD in

conjunction with psychotherapy.

While still pending receipt of Dr. Jung's report and prior to TEG acting on said report,

Mr. Phillips' life started to fall apart. According to his attorney David Ring, in the two months

following the SRV hearing, Mr. Phillips had been instructed to move out of the residence he

shared with his fiancé, Marylynn Mataska, after she admitted to the probation officer that she

was using methamphetamine. Mr. Phillips moved his possessions to storage and became a

transient, using a welding shop as his residence.

As a certified welder, according to Mr. Ring, Mr. Phillips had taken advantage of a great

employment opportunity -- building lighting, stages, and set pieces for a local movie production

company. He worked long hours to meet filming on-location demands, which interfered with his supervision, counseling, and personal relationships. One week, he followed his probation officer's instructions to report for an appointment and a drug test. While he attempted to do this during his lunch hour, his meeting with his probation officer lasted well past the lunch hour, and Mr. Phillips was summarily fired by the production company. This job termination emotionally devastated Mr. Phillips and caused him to become unable to eat and sleep regularly, leading to his continued self-medication by substance abuse.

Mr. Phillips deeply regrets his inability to take advantage of the opportunity provided to him by the Court and his treatment providers. Instead, soon after the SRV hearing, his life spiraled downward into the addictive which culminated in his arrest in this case. On November 15, 2019, prior to his arrest that evening, it was Mr. Phillips intent and desire to have the police shoot and kill him. It was only a phone conversation with a family member while barricaded inside the welding shop that persuaded Mr. Phillips to walk outside the welding shop and allow himself to be taken into custody without incident.

## III.    Legal Argument

A downward variance is warranted in this case because the circumstances of this case are outside the "heartland of cases" which the Sentencing Commission considered when establishing the Guidelines. "A 'variance . . . occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of factors outlined in 18 U.S.C. § 3553(a)." *United States v. Robinson*, 741 F.3d 588, 600 (5th Cir. 2014). A variance by the sentencing court must be reasonable and justified by the facts of the case. *Gall v. United States*, 552 U.S. 38 (2007). A variance "is based entirely on the sentencing court's discretionary

authority as long as the court justifies its sentence based on the § 3553(a) factors." *United States v. Barnes,* 890 F.3d 910, 920 n. 1 (10th Cir. 2018).

A sentencing court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Rather, the guideline sentence is advisory rather than mandatory and sentencing courts possess the discretion to vary from the guideline range. *United States v. Barnes,*  890 F.3d 910, 920 n. 1 (10th Cir. 2018). The threshold question in the granting of a downward variance is whether, after application of all the factors enumerated in 18 U.S.C. § 3553(a), this case lies outside the heartland of typical cases contemplated by Congress when it created the Sentencing Guidelines. *U.S. v. Martinez-Barragan*, 545 F.3d 894, 900 (10th Cir. 2008) Before rendering its decision, a sentencing court must consider all the factors enumerated in 18 U.S.C. § 3553(a) to determine if such factors warrant adjusting the sentence. *United States v. Beltran*, 571 F.3d 1013, 1019 (10th Cir. 2009).

Also, a variance does not require extraordinary circumstances to depart from the Sentencing Guidelines. *Id.*; see *United States v. Limon*, 273 F. App'x 698, 706 (10th Cir. 2008) (citing *United States v. Smart*, 518 F.3d 800, 807 (10th Cir. 2008) (same)).  "The Court's task is . . . to come up with a sentence that accurately reflects the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Yazzie*, No. CR 10-1761 JB, 2014 WL 1948244, at *30 (D.N.M. May 7, 2014) (citing *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007)); see also *United States v. Marcellus*, No. CR 10-3452 JB, 2012 WL 4949369, at *5 (D.N.M. Sept. 5, 2012) (same); *United States v. Lovato*, 798 F. Supp. 2d 1257, 1260 (D.N.M. 2011) (same).

The "federal judicial tradition . . . [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes

magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)).

A downward variance on Mr. Phillips' Guidelines sentence of 235-293 months to ten (10) years or 120 months is warranted upon a consideration of the factors under 18 U.S.C. § 3553(a). A ten-year sentence, a decade in prison, is "sufficient, but not greater than necessary" and reflects the seriousness of Mr. Phillips offenses, provides just punishment to Mr. Phillips, promotes respect for the law, and will protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2).

**A.     The 18 U.S.C. § 3553(a) Factors as Applied to Mr. Phillips:**

**(1) The nature of the offense and history and characteristics of the defendant.**

The evidence establishes that on November 15, 2019, while Mr. Phillips was on federal supervised release for his prior conviction in case no. 09-CR-3601-MV, United States Probation Officers ("USPO") conducted a visit at his home. Mr. Phillips was not home, and the officers returned later that evening to find him sitting in the driver's seat of his truck. Upon unlocking and opening the truck door, the probation officer smelled a prevalent odor that appeared to be marijuana. The probation officer asked Mr. Phillips for permission to look in the truck, and Mr. Phillips agreed. Inside the truck, probation officers discovered a backpack containing narcotics and paraphernalia, including methamphetamine, marijuana, lysergic acid diethylamide, suboxone strips, plastic bags, a digital scale, hypodermic needles, numerous smoking devices, and more.

At the time he was speaking to the APD crisis negotiator, Mr. Phillips was under high stress and was threatening suicide. There is no dispute that Mr. Phillips' mental health conditions – namely, Bipolar Disorder (depressive phase), Post-traumatic Stress Disorder (chronic) ("PTSD"), Polysubstance Dependence, Attention Deficit Hyperactive Disorder ("ADHD"), Depression – played a leading role in Mr. Phillips' offense conduct. His mental health conditions, as described

previously in the background section of this pleading, coupled with his powerful methamphetamine addiction are indeed present "to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3.

While previously incarcerated, Mr. Phillips has been prescribed a broad array of antidepressant and mood stabilizing medications. Unfortunately, these medications were only marginally effective. While incarcerated, the mental health counseling and limited medication regimen he received was not intensive or comprehensive. It seemed designed to enable Mr. Phillips to function within the prison system (i.e., not to pose a danger to himself, staff, or other inmates), as opposed to providing him the insight and coping mechanisms to permanently change or reorient his behavior patterns.

Outside of prison, while on supervised release, Mr. Phillips was not able to overcome his addiction which is complicated by his multiple underlying mental health issues.  Mr. Phillips recalls that while on supervised release he requested specific medication such as Adderall and Suboxone. Understandably, his treatment providers were reluctant to prescribe certain medication absent an updated neuropsychological evaluation. Unfortunately, the updated evaluation was not completed until October 8, 2019, after Mr. Phillips had fully succumbed to his  meth addiction[3].

---

[3] Meth "is a highly addictive and extremely dangerous stimulant drug." Rai Cornell, Meth's Extreme Harm, American Addiction Centers (July 16, 2021), https://bit.ly/3eKoIXY. "Chronic meth use can result in a pervasive decline in physical and mental health." Id. (footnote omitted). Treatment and recovery is difficult in part because the withdrawal experience is so intense, including symptoms "such as anxiety, depression, fatigue, symptoms of psychosis, and intense drug cravings. The sheer level of discomfort that accompanies acute stimulant withdrawal frequently leads former meth users to relapse." Id. (footnote omitted).

> It is important to note that relapse does not mean that recovery has failed or that the individual will never be able to abstain from meth. Rather, many professionals believe meth relapse statistics indicate that relapse is a natural part of the recovery process. They believe that when relapse occurs, it means the patient has not identified the root cause of their drug use yet.

Id. (footnotes omitted).

Notably, Mr. Phillips has been engaged with the mental health system since grade school, including seeing counselors and therapists and receiving a variety of medications throughout his life to address his mental health and emotional issues.  Also, while there is no disputing the crimes previously committed by Mr. Phillips, it is important to emphasize that he does not have a criminal mind. Rather, he has an addicted mind. Mr. Phillips accepts that he needs to be held accountable and his conduct requires incarceration.  Mr. Phillips submits that the Guidelines Sentence is simply too much – "greater than necessary" -- and would likely kill any of Mr. Phillips' own hope and motivation to invest in himself while incarcerated.[4] Mr. Phillips respectfully requests that the Court, in the exercise of its discretion and application of the relevant § 3553(a) factors grant a downward variance to his Guidelines sentence and impose a ten-year sentence,  which sentence is sufficient, but not greater than necessary and appropriately takes into account Mr. Phillips' mental health and addiction issues.

**(2) The need or purpose of sentencing.**

18 U.S.C. § 3553(a)(2) outlines the considerations for the need or purpose of the sentence imposed:

 A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 B. to afford adequate deterrence to criminal conduct;
 C. to protect the public from further crimes of the defendant; and
 D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 USC §3553(a)(2)(D) allows the Court to consider the Mr. Phillips's need for medical or mental health care when considering a variance. Mr. Phillips' primary needs include mental health treatment and effective management of his medication. Mr. Phillips' placement in the

---

[4] If Mr. Phillips were to receive the low end of the Guidelines range of 235 months, he would be close to 60 years old when he was released (not including good time). If he were to receive the high end of 293 months, he would be closer to age 65 when he was released (not including good time).

appropriate Care Level[5] for his mental health circumstances will provide him with "needed educational and vocational training, medical care, or other correctional treatment in the most effective manner" which will facilitate Mr. Phillips' recovery and skills development for productive functioning in society as well as provide an adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2).

**(3) The kinds of sentences available and (4) the sentencing range established by the Sentencing Guidelines.**

Mr. Phillips is subject to incarceration, supervised release, fines, restitution, and denial of federal benefits for up to five years after his conviction. Doc 99, ¶¶ 86-103. Undersigned counsel requests a variance in Mr. Phillips Guidelines Sentence to ten (10) years or 120 months incarceration and supervised release which may require a post-incarceration evaluation and/or long term participation mental health counseling and treatment. The PSR assesses that under USSG §5D1.2(a)(1), Mr. Phillips' conviction under Count 1 is a Class A Felony with a guidelines range of two to five years supervised release. Id., ¶ 91. For Count 2, under USSG §5D1.2(c)(c), the guideline term of supervised release is five tears. Id.

---

[5] The BOP describes Care Level 3 as the following:

- Care Level 3 inmates are outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications.
- They may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions. Stabilization of medical or mental health conditions may require periodic hospitalization.
- Example conditions: Cancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, severe (NYHA Class III) congestive heart failure, and end-stage liver disease.

*Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Federal BOP Clinical Guidance, at 3 (May 2019), https://bit.ly/3g8FX1a.

A term of supervised release in addition to incarceration would require that Mr. Phillips participate in further supervision and mental health treatment which would also address the Section 3553 factors and facilitate Mr. Phillips' hopeful successful transition back to society. While it would be improper for the court to sentence Mr. Phillips "<u>solely</u> for his rehabilitative purposes or correctional treatment," these are to be considered as one of the 3553 factors. *United States v. Limon*, 273 F. App'x 698, 708 (10th Cir. 2008) (citing *United States v. Tsosie*, 376 F.3d 1210, 1215 (10th Cir. 2004)) (emphasis in original).

**(5) Pertinent policy statements issued by the Sentencing Commission**

The § 3553(a)(2) factors require the court to consider Mr. Phillips's need for treatment when it assesses the reasonableness of a sentence. *United States v. Limon*, 273 F. App'x 698, 707 (10th Cir. 2008) ("the need for medical treatment is a factor explicitly enumerated in § 3553(a)(2)(D), and. . . it is a factor the district court must consider under a § 3553(a) procedural reasonableness analysis").

The Guidelines policy addressing mental health and emotional conditions of the Mr. Phillips states that

> [m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

U.S.S.G. § 5H1.3. The policy goes on to state that "[i]n certain cases a downward departure may be appropriate to accomplish a specific treatment purpose." Id. Finally, the policy states that "[m]ental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program." Id. (citing §5B1.3(d)(5) and §5D1.3(d)(5) (each of which provide for mental health treatment as a condition of probation)).

14

## CONCLUSION

WHEREFORE, for the foregoing reasons, Mr. Phillips respectfully moves this court to

impose downward variance on the Guidelines Sentence to ten (10) years or 120 months in a BOP

Care Level 3 facility based on a consideration of all applicable Section 3553 factors.

Respectfully Submitted,

By: */s/ Joe M. Romero, Jr.*
Joe M. Romero, Jr.
Romero & Winder, PC
Attorney for Nicholous Phillips
P.O. Box. 25543
Albuquerque, N.M. 87125
(505) 843-9776
EM: joe@romeroandwinder.com

### Certificate of Service

I hereby certify that, on July 27, 2021, the foregoing pleading was filed electronically
pursuant to CM/ECF procedures for the District of New Mexico, which caused the parties and/or
their counsel to be served by electronic transmission, as more fully reflected by the Notice of
Electronic Filing.

*/s/ Joe M. Romero, Jr.*
Joe M. Romero, Jr.